769 S.E.2d 183

George W. THOMAS, Employee, Respondent,

v.

5 STAR TRANSPORTATION, Employer, and S.C. Uninsured Employers Fund, Carrier,

Of whom 5 Star Transportation is the Appellant.

Appellate Case No. 2012–211392.

No. 5298.

Court of Appeals of South Carolina.

Heard Oct. 6, 2014.
Decided Feb. 18, 2015.
Rehearing Denied April 15, 2015.

2

4

Michael E. Chase and Carmelo Barone Sammataro, both of Turner Padget Graham & Laney, P.A., of Columbia, for Appellant.

Malcolm M. Crosland, Jr., of The Steinberg Law Firm, LLP, of Charleston, for Respondent.

KONDUROS, J.

In this workers' compensation case, 5 Star Transportation appeals the Appellate Panel of the Workers' Compensation Commission's awarding benefits to Emily Thomas as George W. Thomas's putative or common law spouse. 5 Star contends the Appellate Panel erred in finding George's injuries arose out of and in the course and scope of his employment because he suffered an aneurysm. 5 Star also maintains the Appellate Panel erred in finding Emily was George's surviving spouse because George was already married when they married. We affirm.

## FACTS/PROCEDURAL HISTORY

5 Star employed George as a tour bus driver. On November 19, 2007, a bus George was driving on Interstate 26 left the road and collided with a tree. George was pronounced dead at the scene. The autopsy noted that George was "witnessed to slump over and become unresponsive prior to driving off the road." Dr. Cynthia Schandl, who performed the forensic autopsy, found the cause of death was "full body blunt trauma complicating ruptured saccular aneurysm of the brain."[1]

George married Cynthia Whaley on February 9, 1995.[2] The two did not have any children together.[3] George and Emily met in 1999 and lived together for about eight years prior to his death.[4] On September 20, 2006, George and Emily had a marriage ceremony. George told Emily a day or two before the ceremony he and Cynthia were divorced. However, George and Cynthia's divorce was not final until February 9, 2007.[5] Emily did not learn about the timing of the divorce until after George's death.

On June 26, 2008, Emily filed a claim for workers' compensation benefits for George's death. 5 Star filed a Form 53, denying George sustained an injury. It also denied Emily was entitled to benefits because her marriage to George was void. The South Carolina Uninsured Employers Fund (the Fund) also filed a Form 53, denying George sustained an injury.

Dr. Schandl testified at her deposition that "there are so many different fatal injuries at that moment of the crash that it's kind of difficult to sort out which one would have made him

---

1. Dr. Schandl found the injuries sustained were not survivable and included multiple fractures and bleeding.

2. George was married two times prior to this and had been divorced both times.

3. George had children with his two previous wives. They were not minors at the time of his death and were not dependent on him.

4. George and Cynthia officially separated on July 1, 2000.

5. Cynthia filed the summons and complaint for divorce on July 10, 2006, and George was served. George was not present at the final hearing on February 9, 2007.

more dead." Dr. Schandl was unable to determine whether the aneurysm occurred before the collision or as a result of it but stated "to a reasonable degree of medical certainty, this condition did not cause death." Dr. Schandl noted two-thirds of patients with the same aneurysm would have survived with half of the survivors being "fine." Dr. Schandl also determined "to a reasonable degree of medical certainty, [George] died as a result of injuries sustained in a motor vehicle collision."

The single commissioner conducted a hearing on the matter on December 19, 2008. The single commissioner found the marriage did not "ripen into a common law marriage" after George's divorce from Cynthia. Accordingly, the single commissioner granted 5 Star and the Fund's motion to dismiss the claim, finding Emily was not the surviving spouse. Emily filed a request for Commission review of the single commissioner's decision. The Appellate Panel reversed the single commissioner, finding it violated Regulation 67–215(B)(1) of the South Carolina Code (2012), which provides "[t]he Commission will not address a motion involving the merits of the claim, including, but not limited to, a motion for dismissal." The Appellate Panel vacated the single commissioner's order and returned the claim to a commissioner for a de novo hearing.

A hearing was held on October 28, 2010, by a different single commissioner. The single commissioner determined George "sustained fatal compensable injuries by accident arising out of and in the course and scope of his employment as a tour bus driver" for 5 Star. It further found Emily was the common-law wife of George at the time of his death and because of that and the putative spouse doctrine, she was entitled to all rights, benefits, and privileges of a surviving spouse.

5 Star filed a Form 30 requesting review of the single commissioner's decision. The Appellate Panel issued an order affirming the single commissioner's order. It determined George suffered compensable injuries because the evidence was that he probably would have survived the ruptured aneurysm and what most probably caused his death was the blunt force trauma suffered in the wreck. It found it was impossible to determine whether the ruptured aneurysm occurred

8

before or after the wreck. The Appellate Panel noted George was driving at a high speed on an interstate and was therefore exposed to an increased risk of injury in the event a physical condition caused him to lose consciousness. The Appellate Panel also found Emily and George held themselves out as husband and wife to the public after George's divorce was finalized. The Appellate Panel accordingly determined Emily and George were common law spouses. The Appellate Panel concluded Emily should also be entitled to benefits under the putative marriage doctrine, which it believed South Carolina courts would adopt. This appeal followed.

**STANDARD OF REVIEW**

■ In a workers' compensation appeal, an appellate court can reverse or modify the Appellate Panel's decision if the appellant's substantial rights have been prejudiced because the decision is affected by an error of law or is "clearly erroneous in view of the reliable, probative and substantial evidence on the whole record." S.C.Code Ann. § 1–23–380(5) (Supp.2014). This court may not "substitute its judgment for that of the [Appellate Panel] as to the weight of the evidence on questions of fact, but may reverse whe[n] the decision is affected by an error of law." *Stone v. Traylor Bros.*, 360 S.C. 271, 274, 600 S.E.2d 551, 552 (Ct.App.2004).

■ "The substantial evidence rule . . . governs the standard of review in a [w]orkers' [c]ompensation decision." *Frame v. Resort Servs. Inc.*, 357 S.C. 520, 527, 593 S.E.2d 491, 494 (Ct.App.2004). The Appellate Panel's decision must be affirmed if supported by substantial evidence in the record. *Shuler v. Gregory Elec.*, 366 S.C. 435, 440, 622 S.E.2d 569, 571 (Ct.App.2005).

Substantial evidence is not a mere scintilla of evidence nor the evidence viewed blindly from one side of the case, but is evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion that the administrative agency reached or must have reached in order to justify its action.

*Lark v. Bi–Lo, Inc.*, 276 S.C. 130, 135, 276 S.E.2d 304, 306 (1981) (internal quotation marks omitted).

## LAW/ANALYSIS

### I. Arising out of and in the Course and Scope of Employment

■ 5 Star argues the Appellate Panel erred in finding George's injuries arose out of and in the course and scope of his employment because his death was caused by an aneurysm. We disagree.

■ "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Palmetto Alliance, Inc. v. S.C. Pub. Serv. Comm'n,* 282 S.C. 430, 432, 319 S.E.2d 695, 696 (1984). In workers' compensation cases, the Appellate Panel is the ultimate finder of fact. *Shealy v. Aiken Cnty.,* 341 S.C. 448, 455, 535 S.E.2d 438, 442 (2000). When the evidence is conflicting over a factual issue, the findings of the Appellate Panel are conclusive. *Hargrove v. Titan Textile Co.,* 360 S.C. 276, 290, 599 S.E.2d 604, 611 (Ct.App.2004). "The final determination of witness credibility and the weight to be accorded evidence is reserved to the [A]ppellate [P]anel." *Bass v. Kenco Grp.,* 366 S.C. 450, 458, 622 S.E.2d 577, 581 (Ct.App.2005). "[I]t is not for this court to balance objective against subjective findings of medical witnesses, or to weigh the testimony of one witness against that of another. That function belongs to the Appellate Panel alone." *Potter v. Spartanburg Sch. Dist. 7,* 395 S.C. 17, 24, 716 S.E.2d 123, 127 (Ct.App.2011) (internal quotation marks omitted). "The general policy in South Carolina is to construe the Workers' Compensation Act in favor of coverage, and any reasonable doubts as to construction should be resolved in favor of the claimant." *Pierre v. Seaside Farms, Inc.,* 386 S.C. 534, 541, 689 S.E.2d 615, 618 (2010) (internal quotation marks omitted).

■ "To be compensable, an injury by accident must be one arising out of and in the course of employment." *Hall v. Desert Aire, Inc.,* 376 S.C. 338, 348, 656 S.E.2d 753, 758 (Ct.App.2007) (internal quotation marks omitted). "Whether an accident arises out of and is in the course and scope of employment is largely a question of fact for the Appellate Panel." *Id.* at 349, 656 S.E.2d at 758. For an injury to arise out of employment, the conditions under which the work must

be performed and the resulting injury must have a causal connection. *Osteen v. Greenville Cnty. Sch. Dist.*, 333 S.C. 43, 50, 508 S.E.2d 21, 25 (1998). "If the injury can be seen to have followed as a natural incident of the work and as a result of the exposure occasioned by the nature of the employment, then it arises out of the employment." *Crosby v. Wal–Mart Store, Inc.*, 330 S.C. 489, 493, 499 S.E.2d 253, 255 (Ct.App. 1998). However, an injury does not arise from employment if it "cannot fairly be traced to the employment as a contributing proximate cause and ... comes from a hazard to which the workmen would have been equally exposed apart from the employment." *Id.* The danger "need not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence." *West v. Alliance Capital*, 368 S.C. 246, 252, 628 S.E.2d 279, 282 (Ct.App.2006) (internal quotation marks omitted).

"Whe[n] the work and the method of doing the work exposes the employee to the forces of nature to a greater extent than he would be if not so engaged, the industry increases the danger from such forces, and the employer is liable." *Hiers v. Brunson Constr. Co.*, 221 S.C. 212, 232, 70 S.E.2d 211, 220 (1952). "In [one] type of idiopathic fall, employment does not cause the fall but it significantly contributes to the injury by placing the employee in a position which increases the dangerous effects of the fall. These injuries are compensable." *Nicholson v. S.C. Dep't of Soc. Servs.*, 411 S.C. 381, 388, 769 S.E.2d 1, 4 (2015) (alteration by court) (internal quotation marks omitted). When a

> fall is unwitnessed or purely unexplained, as in situations where the employee dies before he has an opportunity to relate the occurrence, and there are no eyewitnesses to the occurrence itself, our courts have tended to affirm an award of compensation, deferring to the fact finding discretion of the commission.

*Crosby*, 330 S.C. at 495–96, 499 S.E.2d at 257.

> Stress, mental injuries, heart attacks, strokes, embolisms, or aneur[y]sms arising out of and in the course of employment unaccompanied by physical injury are not considered compensable if they result from any event or series of events

which are incidental to normal employer/employee relations including, but not limited to, personnel actions by the employer such as disciplinary actions, work evaluations, transfers, promotions, demotions, salary reviews, or terminations, except when these actions are taken in an extraordinary and unusual manner.

S.C.Code Ann. § 42-1-160(C) (2015).

An aneurysm in itself is not considered an accident for workers' compensation. It is a natural condition which only becomes a compensable accident if it was brought about by unexpected strain or over-exertion in the performance of the duties of employment or by unusual and extraordinary conditions in the employment.

*Jennings v. Chambers Dev. Co.*, 335 S.C. 249, 256, 516 S.E.2d 453, 457 (Ct.App.1999).

"The South Carolina Workers' Compensation Act was tailored after the North Carolina Act and opinions of the North Carolina Supreme Court construing such Act are entitled to great weight with the appellate courts of this state." *Holley v. Owens Corning Fiberglas Corp.*, 301 S.C. 519, 523, 392 S.E.2d 804, 806 (Ct.App.1990), *cert. granted, opinion adopted,* 302 S.C. 518, 397 S.E.2d 377 (1990). In a North Carolina Supreme Court case similar to the present case, the court found:

The claimant's injury was sustained when the vehicle hit the pole. [A] [b]lackout caused him to lose control of the vehicle which he was driving on an errand of his employer. His work required him to be operating the vehicle at the time and place of the blackout. The injury followed because of the blackout and the position claimant was in at the time it occurred. Had he been in the office or walking on the street, probably no injury-certainly not this one-would have occurred. It appears, therefore, the injury was directly connected to the employment. The majority, but not all courts, seem to adopt this view.

*Allred v. Allred–Gardner, Inc.*, 253 N.C. 554, 117 S.E.2d 476, 478 (1960).

In another North Carolina case, "[t]he Commission found that plaintiff suffered a syncopal episode (i.e., blackout) while operating defendant-employer's truck, after which time the

truck ran off the road, hit a light pole, and flipped over."
*Billings v. Gen. Parts, Inc.*, 187 N.C.App. 580, 654 S.E.2d 254,
259 (2007), *review denied,* 362 N.C. 233, 659 S.E.2d 435 (2008).

> The Commission concluded: "The hazards or risks inciden-
> tal to plaintiff's employment were a contributing proximate
> cause of plaintiff's accident and resulting injuries. The risk
> of driving a truck aggravated, accelerated, or combined with
> plaintiff's pre-existing condition to produce his injury.
> Thus, plaintiff's injuries arose out of and in the course of his
> employment, as they were the result of his June 2, 2003
> work-related accident."

*Id.* The court determined, "The Commission's conclusion was
supported by its findings of fact and correct as a matter of
law." *Id.*

In this case, the Appellate Panel found George's death arose
out of and in the course of employment because he was placed
in an increased danger by driving a bus at a high rate of speed
on an interstate. Dr. Schandl's testimony, report, and memo-
randum all indicate George's death was due to the injuries
from the motor vehicle accident, not the brain aneurysm. 5
Star did not present any evidence to the contrary but instead
argued Emily did not prove the aneurysm occurred after the
accident, not before. Although Dr. Scandl could not deter-
mine if the aneurysm occurred before the accident, thus
causing the accident, or after the crash, because of the acci-
dent, she testified two-thirds of people experiencing such an
aneurysm would survive. Accordingly, substantial evidence
supports the Appellate Panel's finding George's death was in
the course and scope of his employment.

## II. Common Law Marriage

 5 Star contends the Appellate Panel erred in finding
Emily was a surviving spouse because she and George had a
common law marriage as he was already married when the
two of them married. We agree.

The determination by the Appellate Panel of the existence
of a common-law marriage is a question of fact. *See Byers v.
Mount Vernon Mills, Inc.*, 268 S.C. 68, 71, 231 S.E.2d 699, 700
(1977). "[T]he possibility of drawing two inconsistent conclu-
sions from the evidence does not prevent an administrative
agency's finding from being supported by substantial evi-

dence." *Palmetto Alliance*, 282 S.C. at 432, 319 S.E.2d at 696. In workers' compensation cases, the Appellate Panel is the ultimate finder of fact. *Shealy*, 341 S.C. at 455, 535 S.E.2d at 442. When the evidence is conflicting over a factual issue, the findings of the Appellate Panel are conclusive. *Hargrove*, 360 S.C. at 290, 599 S.E.2d at 611. "The final determination of witness credibility and the weight to be accorded evidence is reserved to the [A]ppellate [P]anel." *Bass*, 366 S.C. at 458, 622 S.E.2d at 581. "[I]t is not for this court to balance objective against subjective findings of medical witnesses, or to weigh the testimony of one witness against that of another. That function belongs to the Appellate Panel alone." *Potter*, 395 S.C. at 24, 716 S.E.2d at 127 (internal quotation marks omitted).

Section 42-9-290 of the South Carolina Code (2015) provides if an employee dies as the result of an accident arising out of the course of employment, the employer must provide death benefits to dependents wholly dependent on the decedent's earnings for support. "A surviving spouse . . . shall be conclusively presumed to be wholly dependent for support on a deceased employee." S.C.Code Ann. § 42-9-110 (1985). "The term 'surviving spouse' includes only the decedent's wife or husband living with or dependent for support upon the decedent at the time of the decedent's death or living apart from the decedent for justifiable cause or by reason of desertion by the decedent at such time." S.C.Code Ann. § 42-1-175 (1985).

 "A common-law marriage is formed when two parties contract to be married." *Callen v. Callen*, 365 S.C. 618, 624, 620 S.E.2d 59, 62 (2005). However, an express contract is not needed; instead, "the agreement may be inferred from the circumstances." *Id.* Therefore, the fact finder must

> look for mutual assent: the intent of each party to be married to the other and a mutual understanding of each party's intent. Consideration is the participation in the marriage. If these factual elements are present, then the court should find as a matter of law that a common-law marriage exists.

*Id.* "[W]hen the proponent proves that the parties participated in 'apparently matrimonial' cohabitation, and that while coha-

bitating the parties had a reputation in the community as being married, a rebuttable presumption arises that a common-law marriage was created." *Id.* A party may overcome the presumption by presenting strong, cogent evidence the parties never agreed to marry. *Id.*

> When, however, there is an impediment to marriage, such as one party's existing marriage to a third person, no common-law marriage may be formed, regardless whether mutual assent is present. Further, after the impediment is removed, the relationship is not automatically transformed into a common-law marriage. Instead, it is presumed that relationship remains non-marital. For the relationship to become marital, there must be a new mutual agreement either by way of civil ceremony or by way of recognition of the illicit relation and a new agreement to enter into a common law marriage.

*Id.* (internal quotation marks omitted).

> [A] relationship illicit at its inception does not ripen into a common law marriage once the impediment to marriage is removed. Instead, the law ... presumes that the relationship retains its illicit character after removal of the impediment. In order for a common law marriage to arise, the parties must agree to enter into a common law marriage after the impediment is removed, though such agreement may be gathered from the conduct of the parties.

*Prevatte v. Prevatte,* 297 S.C. 345, 349, 377 S.E.2d 114, 117 (Ct.App.1989) (internal quotation marks omitted).

"In *Prevatte,* the [c]ourt of [a]ppeals raised the split of authority as to whether the parties must have knowledge that the impediment has been removed. The court decided that it need not resolve the issue because the parties there were aware of the impediment and its removal." *Callen,* 365 S.C. at 625 n. 1, 620 S.E.2d at 62 n. 1 (citation and internal quotation marks omitted). The supreme court noted, "The issue becomes important in cases in which the parties are aware of the impediment but not its removal. The determination that must be made there is whether the parties truly intended to enter into a valid marriage." *Id.* However, the court found it did not need to resolve the issue in that case because the party asserting the marriage admitted she was never aware of the impediment in the first place. *Id.*

The law is well settled in this state that the removal of an impediment to a marriage contract (the divorce in this case) does not convert an illegal bigamous marriage into a common law legal marriage. After the barrier to marriage has been removed, there must be a new mutual agreement, either by way of civil ceremony or by way of a recognition of the illicit relation and a new agreement to enter into a common law marriage arrangement.

*Byers,* 268 S.C. at 71, 231 S.E.2d at 700.

In *Prevatte,* the purported spouses "knew of the impediment to their marriage at the time they first began living together as husband and wife." 297 S.C. at 349–50, 377 S.E.2d at 117. However, they later came to the conclusion they were married. *Id.* at 350, 377 S.E.2d at 117. They both represented to the court that they were married even though it was contrary to the husband's best interest. *Id.* The court found, "they had somehow come to the conclusion that the impediment to their marriage no longer existed. In fact, the impediment had been removed." *Id.* The court determined "it is clear from their conduct that they thereafter gave every indication of their agreement to be married. The fact that they did not know exactly when the impediment to their marriage had been removed or even how it had been removed is of no consequence, under the circumstances." *Id.*

In *Kirby v. Kirby,* 270 S.C. 137, 139, 141, 241 S.E.2d 415, 416 (1978), the parties conceded their relationship was illicit from the beginning because they both knew one of them was married to another person at the time.

[T]he removal of the impediment to marriage by appellant's divorce ... did not ipso factor convert the parties' illicit relationship into a common law marriage. After the barrier to marriage has been removed there must be a new mutual agreement either by way of civil ceremony or by way of recognition of the illicit relation and a new agreement to enter into a common law marriage.

*Id.* at 141, 241 S.E.2d at 416.

In the present case, Emily testified she did not learn George was not divorced from Cynthia when they married until after his death. Accordingly, because she did not know of the impediment to marriage, she could not recognize it and agree to continue the relationship once it was removed.

Therefore, under South Carolina law, George and Emily's relationship was not converted to a common law marriage once the impediment to their marriage was removed.

## III. Putative Spouse Doctrine

 5 Star asserts the Appellate Panel erred in finding Emily was George's putative spouse because no South Carolina Court has recognized the putative marriage doctrine. We agree.

In *Hill v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*,[6] the supreme court "decline[d] to adopt the putative spouse doctrine, as it is contrary to South Carolina's statutory law and marital jurisprudence." 405 S.C. 423, 426, 747 S.E.2d 791, 792–93 (2013). Accordingly, the Appellate Panel erred in finding Emily was George's putative spouse.

## IV. Good Faith Exception

 "The appellate court may affirm any ruling, order, decision or judgment upon any ground(s) appearing in the Record on Appeal." Rule 220(c), SCACR. "[T]his court[ ] may affirm a trial judge's decision on any ground appearing in the record and, hence, may affirm the trial judge's correct result even though he may have erred on some other ground." *Potomac Leasing Co. v. Otts Mkt., Inc.*, 292 S.C. 603, 606, 358 S.E.2d 154, 156 (Ct.App.1987). The reasoning adopted by the trial court is not binding upon this court if the record discloses a correct result. *Id.*

> [I]f a man and woman enter into a contract of marriage believing in good faith that they are capable of entering into the relation notwithstanding a former marriage, when, in fact, the marriage is still of force, and after the removal of the obstacle of the former marriage the parties continue the relation and hold themselves out as man and wife, such action constitutes them man and wife from the date of the removal of the obstacle.

*Davis v. Whitlock*, 90 S.C. 233, 246, 73 S.E. 171, 175 (1911); *see also Weathers v. Bolt*, 293 S.C. 486, 489, 361 S.E.2d 773, 774 (Ct.App.1987) ("[I]f the parties enter into a contract of marriage believing in 'good faith' that they are capable of

---

6. The opinion was issued by the supreme court after the Appellate Panel issued its order.

marrying and after the removal of all impediments they continue the relationship, they are considered man and wife from the date they became free to marry.").

In a North Carolina case applying South Carolina law, the court found the purported husband and wife entered into a marriage in good faith. *Bowlin v. Bowlin*, 55 N.C.App. 100, 285 S.E.2d 273, 274, 276 (1981). Wife did not learn husband was not divorced from his previous wife when they married until she applied for social security benefits after he died. *Id.* Husband "had told her that he had been to his lawyer's office and received some papers and that he had torn them up. The next day they went to South Carolina and were married." *Id.* On the day they married, husband stated, in wife's presence, he was divorced. *Id.* The court found husband's "good faith belief that he was legally divorced on the date of his marriage is supported by his mother's testimony that [he] said that he was divorced." *Id.* The court noted, "More importantly, there is no evidence to the contrary." *Id.* The court found it could not imply wrong or fraud to husband and held he and wife entered into the marriage ceremony in good faith. *Id.*

In *Bannister v. Bannister*, 150 S.C. 411, 414, 148 S.E. 228, 229 (1929), the supreme court found the parties could not claim they were married in good faith because Husband had no reason to believe his previous wife was deceased and one could reasonably conclude it was a certainty he knew she was living. The court noted testimony was presented that he visited his previous wife and child and vice versa and paid child support for several years after they separated. *Id.* In *Weathers*, 293 S.C. at 489, 361 S.E.2d at 774, this court found the circuit court did not err in implicitly ruling "the parties did not enter the relationship in good faith believing they each had the capacity to marry." The court noted the only evidence of husband's entering the relation in good faith was his testimony his previous wife had told him she obtained a divorce from him. *Id.* However, husband did not verify the information and knew that a subsequent wife had annulled their marriage due to his not being divorced. *Id.* This court found, "It is apparent the probate and circuit courts simply did not believe [husband's] testimony on the good faith issue, in light of overwhelming evidence to the contrary."

Here, the only evidence as to whether George knew of an impediment to his marriage with Emily was Emily's testimony

he said he was divorced from Cynthia. He was served with a summons and complaint for divorce from Cynthia more than two months prior to the marriage ceremony with Emily. Much like *Bowlin,* 5 Star presented no evidence George did not know he could not marry when he and Emily had their marriage ceremony. Additionally, George and Emily continued to act as husband and wife after the impediment was removed. Accordingly, we find Emily was George's surviving spouse because she and George married in good faith.

## CONCLUSION

We affirm the Appellate Panel's decision that George's death occurred in the course and scope of his employment. Although the Appellate Panel erred in determining Emily was George's common law or putative spouse, we affirm that Emily was George's surviving spouse because they entered into marriage with a good faith belief that they could marry and continued to act as husband and wife once the impediment was removed.

**AFFIRMED.**

HUFF and SHORT, JJ., concur.